IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FRIENDS OF MAHA`ULEPU, INC.,  )     CIVIL 15-00205 LEK-BMK
a Hawai`i non-profit          )
corporation,                  )
                              )
          Plaintiff,          )
                              )
     vs.                      )
                              )
HAWAI`I DAIRY FARMS, LLC, a   )
Delaware Limited Liability    )
Company; ULUPONO INITIATIVE,  )
LLC; a Delaware Limited       )
Liability Company; MAHA`ULEPU )
FARMS, LLC; a Delaware        )
Limited Liability Company,    )
                              )
          Defendants.         )
_____)

**ORDER DENYING:  (1) DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT; (2) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
ON LIABILITY; AND (3) PLAINTIFF'S EX PARTE MOTION FOR
LEAVE TO FILE SUPPLEMENTAL DECLARATIONS IN SUPPORT
OF REPLY TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Before the Court are:  Defendants Hawai`i Dairy Farms,

LLC ("Hawai`i Dairy"), Ulupono Initiative, LLC ("Ulupono"), and

Maha`ulepu Farm LLC's ("Maha`ulepu," collectively "Defendants")

Motion for Summary Judgment ("Defendants' Summary Judgment

Motion"), filed on November 25, 2015;[1] and Plaintiff Friends of

_____

[1] Defendants' Motion for Summary Judgment was originally set
for hearing on February 16, 2016.  However, on January 4, 2016,
Plaintiff filed a Fed. R. Civ. P. 56(d) Motion to Defer
Consideration of Defendants' Motion for Summary Judgment (ECF No.
41) ("Rule 56(d) Motion"), which the Court granted on February
29, 2016.  [Dkt. nos. 68 (Rule 56(d) Motion), 89 (order granting
Rule 56(d) Motion).]

Maha`ulepu's ("Friends" or "Plaintiff") Motion for Partial Summary Judgment on Liability ("Plaintiff's Summary Judgment Motion"), filed on July 1, 2016.[2]  [Dkt. nos. 41, 107.]  On September 1, 2016, Defendants filed their Combined Opposition to (ECF 107) Plaintiff's Motion for Partial Summary Judgment and Reply in Support of (ECF 41) Defendants' Motion for Summary Judgment [Local Rule 7.9] ("Defendants' Combined Memorandum").  [Dkt. no. 214.]  The same day, Plaintiff filed its reply ("Plaintiff's Reply").[3]  [Dkt. no. 218.]  Defendant's Summary Judgment Motion and Plaintiff's Summary Judgment Motion (collectively "Summary Judgment Motions") came on for hearing on September 12, 2016.  Also before the Court is Plaintiff's Ex Parte Motion for Leave to File Supplemental Declarations in

_____

[2] Plaintiff's Summary Judgment Motion includes a Memorandum of Points and Authorities in Support of its Motion for Partial Summary Judgment on Liability and Opposition to Defendants' Motion for Summary Judgment (ECF No. 41) ("Plaintiff's Combined Memorandum").

[3] Both parties had a very difficult time complying with the Local Rules and using this district court's electronic case filing system.  In an Entering Order filed on August 25, 2016, the Court deemed many of the incorrectly filed documents withdrawn without prejudice.  [Dkt. no. 159.]  In an Entering Order filed on August 29, 2016, after the parties again filed documents incorrectly, the Court struck a number of documents from the record.  [Dkt. no. 204.]  At a status conference on August 31, 2016, the Court granted the parties leave to re-file certain documents.  [Minutes, filed 8/31/16 (dkt. no. 211).] While the Court is confident that it has sufficiently addressed this matter, the parties are warned that, in the future, any filings in violation of the Local Rules will not be accepted. Further, the Court may consider revoking the pro hac vice status of the offending party.

Support of Reply to Motion for Partial Summary Judgment (ECF No. 107) ("Motion for Leave"), filed on September 1, 2016.  [Dkt. nos. 215, 221.[4]]  The Court finds the Motion for Leave suitable for disposition without a hearing pursuant to Rule 7.2(d) of the Local Rules of Practice of the United States District Court for the District of Hawai`i ("Local Rules").  After careful consideration of the motions, memoranda, and the relevant legal authority, Defendants' Summary Judgment Motion, Plaintiff's Summary Judgment Motion, and the Motion for Leave are all DENIED for the reasons set forth below.

## BACKGROUND

On June 1, 2015, Plaintiff filed its Complaint.  [Dkt. no. 1.]  The Complaint seeks declaratory and injunctive relief, as well as civil penalties against Defendants for violations of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1251, *et seq.*  [Complaint at ¶ 1.]  Specifically, Plaintiff states that it brings the instant suit under 33 U.S.C. § 1365(a)(1)(A).  Plaintiff complied with the notice requirements of the Clean Water Act.  [Id. ¶ at 10.]

Plaintiff submits that Hawai`i Dairy has plans for a 699-cow dairy farm in Maha`ulepu, Kaua`i, with the goal of gradually increasing that number to 2,000 cows ("Project Site").

---

[4] After reviewing the documents closely, it is clear to the Court that docket number 221 is a continuation of docket number 215.

[Id. at ¶ 34.]  Plaintiff alleges that Defendants "have engaged and continue to engage in construction and construction support activities," and have been doing so since early 2014 (possibly as early as January 2014).[5]  [Id. at ¶¶ 36-37.]  On September 9, 2014, Hawai`i Dairy submitted a Notice of Intent ("NOI") to the State of Hawai`i, Department of Health ("DOH"), indicating its plan to operate under a National Pollutant Discharge Elimination System ("NPDES") permit.  DOH did not approve the permit. Hawai`i Dairy reapplied on May 7, 2015, but the application is still pending.  [Id. at ¶¶ 38-39.]  Hawai`i Dairy therefore does not have an NPDES permit.

According to Plaintiff, because the proposed dairy farm is uncovered, any precipitation will cause "unpermitted stormwater runoff" that contains pollutants from the construction.  [Id. at ¶ 44.]  Sources of these pollutants

_____

[5] According to Plaintiff, these activities include

> removal of Guinea grass and other "grubbing" activities to make the ground suitable for planting of non-native Kikuyu grass; installation of irrigation systems and associated piping, some of which may be underground; construction and in-ground installation of concrete watering troughs, including associated piping; digging of an effluent pond to store manure generated by the dairy herd; installation of monitoring wells; road improvements; and the staging of materials and equipment to accomplish the above and other activities.

[Complaint at ¶ 36.]

allegedly include "roadways, raceways, concrete troughs, concrete and compacted limestone platforms for troughs, irrigation pipe installation, wells, and other items, machinery and construction materials stored on the [Project] Site, any vehicles driving on and off the [Project] Site, and others." [Id. at ¶ 45.]  The pollutants themselves include "dirt, debris, sewage sludge from land applications, biological materials, rock, sand, or other materials." [Id. at ¶ 46.]  Plaintiffs assert that the alleged construction activity at the Project Site has resulted in stormwater runoff entering navigable waters, including "a series of ancient agricultural ditches," the Wai`opili Stream and, a short distance thereafter, the Pacific Ocean. [Id. at ¶ 47.]  Moreover, Plaintiff contends that the alleged construction has affected the water quality in Wai`opili Stream. [Id. at ¶ 49.]

Plaintiff brings two claims for relief:
(1) unauthorized discharge of construction pollutants into waters of the United States, in violation of 33 U.S.C. § 1311(a) ("Count I"); [id. at ¶¶ 52-57;] and (2) failure to obtain permit coverage for storm water discharges, in violation of 33 U.S.C. § 1342 ("Count II") [id. at ¶¶ 58-61].  Plaintiff requests:  a declaration that Defendants have violated and continue to violate § 1311(a); a declaration that Defendants have violated and continue to violate § 1342; an order enjoining Defendants from any further storm water discharge containing "construction

related pollutants" unless authorized by the relevant permit; an order that Defendants must immediately comply with the permit requirements; an order that Defendants must pay $37,500 a day, per violation, for violations of the Clean Water Act, pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1.-19.4; an order that Defendants must remediate any harm caused by their violations; an order that Defendants must pay all of Plaintiff's attorneys' and expert witness fees, as well as costs, pursuant to 33 U.S.C. § 1365(d); and "any such other relief as the Court may deem just and proper." [Complaint, Prayer for Relief ¶¶ A-H.]

## DISCUSSION

### I.   Preliminary Matters

#### A.   Motions for Judicial Notice

##### 1.   First Request for Judicial Notice

On December 2, 2016, Defendants filed a Request for Judicial Notice in Support of Motion for Summary Judgment ("First Request for Judicial Notice"). [Dkt. no. 53.[6]] Defendants request judicial notice of the Complaint as well as "[t]he pleadings and papers filed in the above-entitled case."[7] [First Request for Judicial Notice at 2.] This district court has

---

[6] On December 3, 2015, Defendants filed the First Request for Judicial Notice a second time. [Dkt. no. 55.] The Court therefore deems docket number 55 withdrawn.

[7] Defendants state that the Complaint is attached as Exhibit A, but the attachment is actually Defendants' Answer to Complaint. See First Request for Judicial Notice, Exh. A.

stated:

> The court may "take judicial notice of 'matters of public record[,]'" as long as the facts noticed are not "subject to reasonable dispute." Intri-Plex Techs., Inc. v. Crest Grp., Inc., 499 F.3d 1048, 1052 (9th Cir. 2007). However, the court may not take judicial notice of a matter of public record in order to consider "the truth of the facts recited therein." See id. at 690. The court may only take judicial notice of the existence of the matter. See id. (citing S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426-27 (3d Cir. 1999)).

> Matters of public record that may be judicially noticed include records and reports of administrative bodies, see Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994), and documents filed with courts, "both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." United States v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992). The court may also take judicial notice of records of government agencies. See Dent v. Holder, 627 F.3d 365, 371-72 (9th Cir. 2010) (taking judicial notice of agency records).

Bartolotti v. Maui Mem'l Med. Ctr., Civil No. 14-00549 SOM/KSC, 2015 WL 4545818, at *3 (D. Hawai`i July 28, 2015). The First Request for Judicial Notice pertains to court documents, and the Court therefore GRANTS the request. The Court, however, notes that it is only taking judicial notice of the documents' existence.

## 2. Second Motion for Judicial Notice

On September 1, 2016, Defendants filed a Request for Judicial Notice in Support of (214) Defendants' Opposition to

(ECF 107) Plaintiff's Motion for Partial Summary Judgment ("Second Request for Judicial Notice").  [Dkt. no. 216.] Defendants request judicial notice of:  (1) the DOH Clean Water Branch's ("Clean Water Branch") "Waiopili Ditch Sanitary Survey, Kauai Part I," published March 2016 ("DOH Sanitary Survey"); [Second Request for Judicial Notice, Exh. A;] (2) the Clean Water Branch's instructions on "Forms to be used in E-Permitting Portal for the National Pollution Discharge Elimination System (NPDES) Program" ("NPDES Forms"); [id., Exh. B;] and (3) a letter from then-Acting Director of the United States Environmental Protection Agency ("EPA") James F. Pendergast to "Water Division Directors, Regions 1-10," dated February 5, 1998 ("2/5/1998 Pendergast Letter") [id., Exh. C].  For the same reasons and on the same limited basis the Court granted the First Request for Judicial Notice, the Court GRANTS the Second Request for Judicial Notice.

   **B.   <u>Evidentiary Objections</u>**

        On September 1, 2016, Defendants filed Evidentiary Objections to Portions of Declarations of (ECF 110) David J. Erickson, (ECF 111) Bridget Hammerquist, (ECF 113) Eileen Kechloian, (ECF 114) Llewelyn "Billy" Kaoheulauli`i,[8] and (ECF 115) Alan E. Faye, Jr. in Support of Plaintiff's Motion for Partial Summary Judgment (107) ("Evidentiary Objections").  [Dkt.

        [8] This appears to be a misspelling of Kaohelauli`i.

8

no. 220.]  Bridget Hammerquist ("Hammerquist"), Eileen Kechloian

("Kechloian"), Billy Kaohelauli`i ("Kaohelauli`i"), and Alan E.

Faye, Jr. ("Faye") are all members of Friends of Maha`ulepu.  See

Decl. of Bridget Hammerquist ("Hammerquist Decl."), filed 7/1/16

(dkt. no. 111), at ¶ 7 ("I now serve as President, and am co-

founder of, Friends of Maha`ulepu, Inc."); Decl. of Eileen

Kechloian ("Kechloian Decl."), filed 7/1/16 (dkt. no. 113), at

¶ 4 ("I am director and co-founder of Friends of Maha`ulepu,

Inc."); Decl. of Llewelyn "Billy" Kaohelauli`I ("Kaohelauli`I

Decl."), filed 7/1/16 (dkt. no. 114), at ¶ 5 ("As Friends of

Maha`ulepu shares my interest in protecting and preserving the

natural resources of Maha`ulepu, I became a member of Friends in

about October 2014."); Decl. of Alan E. Fayé Jr. ("Fayé Decl."),

filed 7/1/16 (dkt. no. 115), at ¶ 8 ("I became a member of

Friends in June 2015").[9]

        Fed. R. Civ. P. 56(c)(4) states, in relevant part,

"[a]n affidavit or declaration used to support or oppose a motion

must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated."  At the hearing,

_____

        [9] All of the documents in support of Plaintiff's Summary
Judgment Motion and Defendants' Summary Judgment Motion are
incorrectly filed.  See Local Rule LR100.2.5 ("Each exhibit
referenced in a document shall be submitted as a separate CM/ECF
attachment to the main document").  For the sake of clarity, the
Court will refer to the documents as filed.

9

Plaintiff represented that all of the aforementioned declarations were offered for the purpose of establishing Plaintiff's standing.  The declarations are appropriate for this purpose.  If offered for any other purpose, however, the Court agrees with many of Defendants' objections.  The Court makes the following determinations:

- with respect to the Hammerquest Declaration, the Court sustains the objections to paragraphs 6 and 14-19, and overrules the objection as to paragraphs 7;

- with respect to the Kechloian Declaration, the Court sustains the objections to paragraphs 5, 11-14, and 16;

- with respect to the Kaohelauli`i Declaration, the Court sustains the objections to paragraphs 9, 11, 14, and 27-28; and

- with respect to the Fayé Declaration, the Court sustains the objection to paragraph 12, and overrules all other objections.

Plaintiff also challenges the expert testimony of David J. Erickson ("Erickson").  <u>See</u> Decl. of David J. Erickson ("Erickson Decl."), filed 7/1/16 (dkt. no. 110).[10]  Specifically, Defendants argue that Erickson's expertise is hydrogeology and

---

[10] Erickson is the President/Principal Hydrogeologist of Water & Environmental Technologies, Inc., located in Butte, Montana, and is also a Professional Geologist in Utah and Wyoming, and a Certified Professional Geologist with the American Institute of Professional Geologists.  [Erickson Decl. at ¶ 3.]

subsurface waters, and that it is not relevant to issues related to surface water and the Clean Water Act. [Evidentiary Objections at 2.]  In addition, Defendants assert that Erickson has no experience in Hawai`i, and also challenge the methods that Erickson used at an inspection of the Project Site. [Id. at 3-5.]  Expert testimony is governed by Fed. R. Evid. 702, which states, in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue;
> >
> > (b)  the testimony is based on sufficient facts or data;
> >
> > (c)  the testimony is the product of reliable principles and methods; and
> >
> > (d)  the expert has reliably applied the principles and methods to the facts of the case.

Plaintiff has submitted ample evidence of Erickson's experience, including with surface water. [Decl. of David J. Erickson in Supp. of Pltf.'s Motion to Compel, filed 11/5/15 (dkt. no. 39), Exh. 1 (Curriculum Vitae of David. J. Erickson).]  Further, in considering whether to strike an expert's declaration, this district court has ruled that, when a party objecting to an expert's declaration has not requested an evidentiary hearing to

11

determine the relevant expert's qualifications under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993), "assertions . . . do not, without more, establish that [a person] is not qualified as an expert." <u>Haw. Wildlife Fund v. Cty. of Maui</u>, 24 F. Supp. 3d 980, 987 (D. Hawai`i 2014).   This district court "therefore decline[d] to strike any part of" the challenged declaration.   <u>Id.</u>   Here, too, Defendants have not requested a <u>Daubert</u> hearing, and the Court overrules Defendants' objections with respect to the Erickson Declaration.

## II.  <u>Defendants' Summary Judgment Motion</u>

Defendants' Summary Judgment Motion argues that "the alleged Clean Water Act violations were not occurring or reasonably likely to recur at the time Plaintiff filed its Complaint, and Plaintiff lacks standing to bring its Clean Water Act causes of action."[11]  [Mem. in Supp. of Defs.' Summary Judgment Motion at 18.]  Defendants rely heavily <u>Gwaltney v. Chesapeake Bay Fund</u>, 484 U.S. 49, 56 (1987), and states that "citizens suits brought under the Clean Water Act were intended to address present or future violations, not violations which had

---

[11] The Court notes that Defendants do not challenge Plaintiff's standing based upon any claim that Plaintiff cannot bring the instant suit on its members' behalf.  Instead, Defendants standing argument is based on their belief that Plaintiff did not have "the required facts to have standing to bring this case or that any, let alone, all material facts have been established without any genuine dispute of material fact." [Defs.' Combined Mem. at 17.]

wholly occurred in the past." [Id. at 12.] According to Defendants, there were no ongoing violations in the instant matter because:  on June 24, 2014, Defendants stopped construction on the Project Site; since that date, only agricultural work has been conducted on the Project Site; and experts have concluded that the precautions that were taken to control stormwater runoff on the Project Site were sufficient to "satisfy applicable stormwater regulations." [Id. at 15-17.]

### A.  Continuing Violations Under the Clean Water Act

"To establish a violation of the [Clean Water] Act's NPDES requirements, a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source." Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist., 13 F.3d 305, 308 (9th Cir. 1993) (citation omitted).  Each of these terms has a specific definition under the act.  "Discharge of a pollutant" means "(A) any addition of any pollutant to navigable waters from any point source, [and] (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft."  33 U.S.C. § 1362(12).[12]  Moreover, "pollutant" is defined as "dredged

---

[12] In addition, 40 C.F.R. § 122.2(b) states that "[t]his definition includes additions of pollutants into waters of the United States from:  surface runoff which is collected or channelled by man[.]"

spoil, solid waste, incinerator residue, sewage, garbage, sewage

sludge, munitions, chemical wastes, biological materials,

radioactive materials, heat, wrecked or discharged equipment,

rock, sand, cellar dirt and industrial, municipal, and

agricultural waste discharged into water."  § 1362(6).

"Navigable waters" are "the waters of the United States,

including the territorial seas."  § 1362(7).  Finally, "point

source" is defined as

> any discernible, confined and discrete conveyance,
> including but not limited to any pipe, ditch,
> channel, tunnel, conduit, well, discrete fissure,
> container, rolling stock, concentrated animal
> feeding operation, or vessel or other floating
> craft, from which pollutants are or may be
> discharged.  This term does not include
> agricultural stormwater discharges and return
> flows from irrigated agriculture.

§ 1362(14).

Gwaltney concerned the interpretation of § 505(a) of

the Clean Water Act, codified as 33 U.S.C. § 1365(a), which

states, in relevant part:

> any citizen may commence a civil action on his own
> behalf --
>
> > (1) against any person (including (i) the
> > United States, and (ii) any other
> > governmentality or agency to the
> > extent permitted by the eleventh amendment to
> > the Constitution) who is alleged to be in
> > violation of (A) an effluent standard or
> > limitation under this chapter or (B) an order
> > issued by the Administrator or State with
> > respect to such a standard or limitation, or
> >
> > (2) against the Administrator where there is

> alleged a failure of the Administrator to
> perform any act or duty under this chapter
> which is not discretionary with the
> Administrator.

The United States Supreme Court held that the Clean Water Act did

not allow "citizen suits for wholly past violations." <u>Gwaltney</u>,

484 U.S. at 60. The <u>Gwaltney</u> Court further explained that "we

agree that § 505 confers jurisdiction over citizen suits when the

citizen-plaintiffs make a good-faith allegation of continuous or

intermittent violation." <u>Id.</u> at 64. Moreover, "[t]he statute

does not require that a defendant 'be in violation' of the Act at

the commencement of suit; rather, the statute requires that a

defendant be '**alleged** to be in violation.'" <u>Id.</u> (emphasis in

<u>Gwaltney</u>). The Ninth Circuit held that,

> On the matter of proving ongoing violations,
> we agree with the Fourth Circuit's recent decision
> on remand from <u>Gwaltney</u> that a citizen plaintiff
> may prove ongoing violations "either (1) by
> proving violations that continue on or after the
> date the complaint is filed, or (2) by adducing
> evidence from which a reasonable trier of fact
> could find a continuing likelihood of a recurrence
> in intermittent or sporadic violations."
> <u>Chesapeake Bay Foundation v. Gwaltney</u>, 844 F.2d
> 170, 171-72 (4th Cir. 1988), *on remand from* 108 S.
> Ct. 376 (1987). We also agree with the Fourth
> Circuit's definition of what may constitute a
> continuing likelihood of violations.
> "Intermittent or sporadic violations do not cease
> to be ongoing until the date when there is **no real
> likelihood of repetition**." <u>Id.</u> at 172 (emphasis
> added). Thus, the Fourth Circuit linked proof of
> ongoing violations to the Supreme Court's
> discussion of mootness in <u>Gwaltney</u>:

> > Consistent with the guidance of the
> > Supreme Court majority and concurring

> opinions, the district court may wish to
> consider whether remedial actions were
> taken to cure violations, the *ex ante*
> probability that such remedial measures
> would be effective, and any other
> evidence presented during the
> proceedings that bears on **whether the
> risk of defendant's continued violation
> had been completely eradicated** when
> citizen-plaintiffs filed suit.

> Id. (emphasis added).  We believe this is the
> correct approach to proving ongoing violations or
> reasonable likelihood of continuing violations
> under Gwaltney.

Sierra Club v. Union Oil Co. of Cal., 853 F.2d 667, 671 (9th Cir.

1988).

### B.  **Regulatory Framework of the Clean Water Act**

### 1.  **General Background**

This district court has described the background of the

Clean Water Act:

> Congress enacted the Clean Water Act in 1972
> "to restore and maintain the chemical, physical
> and biological integrity of the Nation's waters."
> 33 U.S.C. §§ 1251-1386.  The [Clean Water] Act
> prohibits discharge of any pollutants into the
> nation's waters except when specifically
> authorized under the [Clean Water] Act.  33 U.S.C.
> § 1311(a).  Pursuant to section 402(a), National
> Pollutant Discharge Elimination System ("NPDES")
> permits can be issued to particular entities,
> allowing them to discharge limited amounts of
> pollutants into surface waters.  33 U.S.C.
> § 1342(a).  Section 402(b) also permits each state
> to implement the Clean Water Act through its own
> permit program, so long as the program conforms to
> federal guidelines approved by the [United States
> Environmental Protection Agency ("EPA")]
> administrator.  33 U.S.C. § 1342(b).  The EPA
> administrator has authorized the Department of

Health of Hawaii to issue and enforce discharge permits.

The Act subjects applicants for and holders of state NPDES permits to both state and federal enforcement actions for failure to comply with the permit requirements.  33 U.S.C. §§ 1319, 1342(b)(7). . . .

In 1987, Congress amended the Clean Water Act to address the threat of pollution carried by storm water runoff into nearby surface waters. Under the amendments, discharges resulting from commercial or industrial activities which disturb more than five acres of land require a permit. Section 402(p), 33 U.S.C. § 1342(p).

Molokai Chamber of Commerce v. Kukui (Molokai), Inc., 891 F. Supp. 1389, 1392-93 (D. Hawai`i 1995).

## 2.   **DOH Administration of Discharge Permits**

Molokai also discusses the role that the State of Hawai`i assumed in enforcing the storm water requirements of the Clean Water Act:

On October 29, 1992, Hawaii DOH amended its Water Pollution Control regulations to implement the new federal storm water permitting requirements.[13]  [Haw. Admin. R. §] 11-55.  Like all state NPDES permit programs, state-issued general permits must at least meet the federal requirements contained in 40 C.F.R. § 122.28. [Haw. Admin. R.] § 11-55-34.01.  The DOH regulations include general permit administrative rules and six general permits.  [Haw. Admin. R.] § 11-55-34, *et. seq.*  Under the rules, dischargers must comply with "Standard General Permit Conditions" specified in Appendix A, imposing the same obligations on the permittee as the EPA

---

13 "Storm water" is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage."  40 C.F.R. § 122.26(b)(13).

permit. 57 Fed. Reg. 44412, 22. Appendix C
provides a general permit for storm water
discharges associated with construction activity.

A person seeking coverage under the general
permit for discharge associated with construction
"shall comply with the NOI requirements of
§ 11-55-34.08." [Haw. Admin. R. §] 11-55,
Appendix C, § 3(a). In order to be covered under
a general permit, an applicant must submit a NOI
"no later than ninety calendar days before the
start of activities or discharges." [Haw. Admin.
R.] § 11-55-34.08(j). Appendix C incorporates the
90-day requirement:

> The developer or operator, normally the
> general contractor, of a proposed site
> with storm water discharges associated
> with a construction activity shall
> submit a complete NOI no less than 90
> days before the proposed construction
> starting date in order to be covered
> under this general permit.

Id. at § 1(b). After receipt of a complete NOI:

> the director shall notify the NOI
> submitter in writing whether the
> proposed activity or discharge[s] is or
> are covered under a general permit or an
> individual permit application is
> required. Notification is complete upon
> mailing or facsimile transmission.

[Haw. Admin. R.] § 11-55-34.09(a). The general
permit for discharge associated with construction
provides that it covers discharges "for which a
complete Notice of Intent (NOI) has been submitted
and a Notice of General Permit Coverage (NGPC) has
been issued by the director." [Haw. Admin. R.]
§ 11-55, Appendix C, § 1(b). The NOI must include
a "Best Management Plan," which must meet the
requirements of the regulations. Id., Appendix C,
§ 5(b), (d). "The 90-day period, as specified in
subsection 1(b), shall not begin counting until
the date the plan is deemed to be satisfied by the
director." Id., Appendix C, § 5(c).

18

Id. at 1393-94 (some alterations in Molokai).

### 3. **Specific Requirements Under Hawai`i Law**

Haw. Admin. R. § 11-55-04 explains the NPDES permitting process:

> (a) Before discharging any pollutant, or beginning construction activities that disturb one or more acres of land or construction activities that disturb less than one acre of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb one acre or more of total land area, or substantially altering the quality of any discharges, or substantially increasing the quantity of any discharges, a person shall submit a complete NPDES permit application (which shall include whole effluent toxicity testing data as specified in 40 CFR § 122.21(j)(5)), submit a complete notice of intent, except for the point source discharges from the application of pesticides, if not required (refer to Appendix M) or, for certain storm water discharges, meet all requirements for a conditional "no exposure" exclusion.

"Disturbance of land" is defined as

> the penetration, turning, or moving of soil or resurfacing of pavement with exposure of the base course or the exposure of bare soil or ground surface, including the land surface exposed by construction roads, baseyards, staging areas, demolition, headquarters, and parking areas.  It does not include grass or weed cutting, bush or tree trimming or felling that leaves soil or ground intact.  It includes "grubbing" in its normal meaning of the use of equipment to knock down and push vegetation out of the way, typically uprooting vegetation and disturbing the ground surface.

Haw. Admin. R. § 11-55, Appendix C, § 1.4.

Further, the general permit associated with storm water

discharges associated with construction activity notes that it

> covers discharges composed entirely of storm water
> runoff associated with construction activities,
> including, but not limited to, clearing, grading,
> excavation, and construction support activities
> that result in the disturbance of one acre or more
> of total land area.  This general permit also
> covers activities that disturb less than one acre
> of total land area that is part of a larger common
> plan of development or sale if the larger common
> plan will ultimately disturb one acre or more of
> total land area.

Id., § 1.1.  "A larger common plan of development or sale" is

defined as

> a contiguous area where multiple separate and
> distinct construction activities may be taking
> place at differing times on different schedules
> under on plan.  "Common plan" is broadly defined
> as any announcement or piece of documentation
> (including a sign, public notice or hearing, sales
> pitch, advertisement, drawing, permit application,
> zoning request, computer design, etc.) or physical
> demarcation (including boundary signs, lot stakes,
> surveyor markings, etc.) indicating construction
> activities may occur on a specific plot.

Id., § 1.5.

### C.   **Possible Exemptions**

Defendants argue that, pursuant to the DOH Sanitary

Survey, they do not need an NPDES permit for their current

activities at the Project Site.  [Defs.' Combined Mem. at 4.]

The DOH Sanitary Survey states that "[h]igh enterococci bacteria

levels have been measured in the Waiopoli Ditch," and that

"[e]nterococci has traditionally been used to indicate sewage

contamination."  [DOH Sanitary Survey at 8.]  In addition, DOH

states that "[a]nimal fecal contamination of Waiopili Ditch could be a source of concern." [Id. at 9.]  With regard to Hawai`i Dairy, the DOH Sanitary Survey notes:

> DOH also received complaints from people citing potential ground water contamination, cattle manure discharge into State waters, odor, flies, and improper location of the proposed Hawaii Dairy Farms LLC (HDF) dairy.  There is a claim that [Hawai`i Dairy] has already contaminated Waiopili Ditch, which is also in the same sub-watershed as the proposed farm.  Currently, there are no dairy cattle on property.  Several people have request that [Hawai`i Dairy] obtain a[n NPDES] permit . . . .  An NPDES permit is currently not a requirement for their proposed operation.

[Id. at 12.]  Plaintiff argues that DOH Sanitary Survey refers to a concentrated animal feeding operation ("CAFO") NPDES permit, which "is distinct from, and in addition to, the requirement that Defendants obtain a[n] NPDES Permit for stormwater discharges from construction activities." [Plaintiff's Reply at 11-12.] Plaintiff also argues that Defendants have acknowledged this distinction and that Defendants have admitted that they need an NPDES permit for some of their desired construction activities. As such, "Defendants' arguments in its response are therefore entirely disingenuous." [Id. at 12.]

The federal regulations distinguish between NPDES permits for concentrated animal feeding operations ("CAFO") and storm water discharges.  See 40 C.F.R. § 122.23 (explaining NPDES permitting requirements for CAFOs); 40 C.F.R. § 122.26 (explaining NPDES permitting requirements for storm water).

Defendants are also well aware of this distinction.  See Decl. of Charles M. Tebbutt ("Tebbutt Decl."), filed 7/1/16 (dkt. no. 109), Exh. 2 (Hawai`i Dairy's Draft Environmental Impact Statement, Volume I, dated May 2016) ("May 2016 EIS") at 2 (listing the required permits for Defendants' project, including an NPDES Construction Stormwater General Permit and a separate NPDES CAFO Permit).  Defendants' Summary Judgment Motion also argues that "[o]n May 7, 2015, [Hawai`I Dairy] submitted an application for an NPDES permit to [DOH], which is currently still under review." [Mem. in Supp. of Defs.' Summary Judgment Motion at 7.]  At no point have Defendants informed the Court that they have withdrawn their NPDES permit application because it is no longer necessary or that DOH has responded to their application by telling them that a permit is not required.  The meaning of the DOH Sanitary Survey is therefore a disputed issue of material fact.  Accordingly, Defendants are not entitled to summary judgment based upon this document alone.  See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

D.    **Alleged Violations of the Clean Water Act**

In the instant matter, it is undisputed that Defendants have never had an NPDES permit.  In addition, Defendants admit

22

that:

      5.   The scope of construction performed at the [Project Site] from February 2014 until June 2014 consisted of the following:

          (a)  Installation of one eight inch water main to feed one irrigation pivot sprinkler;

          (b)  Installation and connection of one stationary pivot irrigation system that operates today;

          ©   Construction of one stationary pivot irrigation system that is not connected or operating as of today;

          (d)  Placement of bridges over drain lines above the grade to allow pivot irrigation system to cross over drain lines;

          (e)  Installation of several small diameter lateral water lines feeding several circular concrete water troughs; and

          (f)  Installation of the water trough pads above the grade, which generally included the importing of locally-sourced granular material to build up to a level surface for their placement rather than excavating.

      . . . .

      7.   In addition, between February and April of 2015, ground work, drilling, casing and grouting work was completed on four separate vertical monitor wells.  Final locking caps were installed on the wells in May and June of 2015.

[Decl. of James Garmatz ("Garmatz Decl."),[14] filed 11/25/15 (dkt.

_____

    [14] James Garmatz ("Garmatz") is the Farm Manager at Hawai`i Dairy and the sole employee of the company.  [Garmatz Decl. at
                             (continued...)

no. 43), at ¶¶ 5-7.]  Garmatz also states that:

> Since construction and development was stopped, I
> have done only agricultural work on the property.
> That ongoing work is limited to maintaining the
> grass and the borders, irrigating/watering, mowing
> grass, trimming trees for installation of new
> fencing, and the application of fertilizer at
> agronomic rates.  To irrigate the approximate 85
> acres on a timely basis is to apply at least 0.3
> inches of water daily.  This process allows the
> circular pivot system to cross the drain lines via
> the bridges enabling the pivot to reach all the
> acres.  The application of fertilizer is done
> every 18 days with a mechanical fertilizer
> spreader.  The fertilizer being spread is a custom
> formula that is mixed after soil samples are taken
> and analyzed and the proper mixture of [sic] is
> recommended by an agronomist.  I also mow all the
> approximately 85 acres to a level of 7-8 inches
> tall and this, in most part, is done weekly.

[Id. at ¶ 12.]

In addition to these activities, the record establishes
that a thirty-nine acre area was harrowed five times from July
2015 to August 2015, [Tebbutt Decl., Exh. 3 (6/13/16 Depo. of
James J. Garmatz) ("Pltf.'s Garmatz Depo.") at 77,] and
Defendants continue to disc a perimeter around a four-acre
nursery to a depth of six inches [id. at 110-11].  Moreover, on
July 1, 2015, Defendants admit that they used a backhoe to
replace bolts in an irrigation pivot, [Defs.' Concise State of
Facts in Opposition to Plaintiff's Summary Judgment Motion
("Defs.' CSOF in Opp."), filed 9/1/16 (dkt. no. 219), Decl. of

---

[14](...continued)
¶¶ 1, 4.]

Dirk. B. Paloutzian ("Paloutzian Decl."), Exh. A (6/13/16 Depo.
of James J. Garmatz) ("Defs.' Garmatz Depo.") at 121,] and, on
August 3, 2015, they used a backhoe to fix a broken irrigation
line riser [id. at 123-24].[15]

### 1. Common Plan of Development

Defendants argue that the "development of land for the
purpose of growing crops, and all incidental construction that
entails, is not a construction activity subject to NPDES
requirements." [Defs.' Combined Mem. at 5.] However, this
distinction is only relevant if the activity is not part of a
common plan of development. This district court has stated:

> The "plan" in a common plan of development is
> broadly defined by the EPA as any announcement or
> piece of documentation or physical demarcation
> indicating construction activities may occur on a
> specific plot. The EPA further clarified what is
> meant by a "larger common plan of development":
>
> > "Part of a larger common plan of
> > development or sale" is a contiguous
> > area where multiple separate and
> > distinct construction activities may be
> > taking place at different times on
> > different schedules under one plan.
> > Thus, if a distinct construction
> > activity has been identified onsite by
> > the time the [NPDES] application would
> > be submitted, that distinct activity
> > should be included as part of a larger
> > plan.

Na Mamo O `Aha`ino v. Galiher, 28 F. Supp. 2d 1258, 1263 (D.

---

[15] The use of the backhoe on August 3, 2015, involved
digging "down like, again, 8 or 12 inches and reset the riser on
the main line." [Pltf.'s Garmatz Depo. at 123-24.]

Hawai`i 1998) (alterations in <u>Na Mamo</u>) (citing NPDES Storm Water Program Question and Answer Document Volume I, March 1992, page 16), *abrogated on other grounds by*, <u>Nw. Envtl. Def. Ctr. v. Decker</u>, 728 F.3d 1085 (9th Cir. 2013).  In <u>Na Mamo</u>, this district court ruled that because access roads used for farming purposes fall within the agricultural exception to NPDES permit requirements, and that "[the d]efendants' remaining activities did not result in the disturbance of more than five acres and were not carried out pursuant to a 'larger common plan of development,'" an NPDES permit was not required.  <u>Id.</u>  The plaintiff in <u>Na Mamo</u> challenged the construction of, *inter alia*, a "helipad and utility barn," but could only point to a document dated after the relevant time period and a document that showed that the defendants "intended to develop their land for agriculture and farming," not "that they intended to carry out construction activities."  <u>Id.</u> at 1260, 1263.

Here, it is clear that Defendants' actions were undertaken pursuant to a common plan of development.  Defendants' NPDES Form C Application,[16] submitted to DOH on March 7, 2015, describes the project:

> A pasture-based rotational grazing, dairy facility for 699 cows (DOH Waste Management Plan) reviewed will be constructed.  Construction items

---

[16] This is an application for coverage under the general permit for storm water discharged related to construction activities pursuant to Haw. Admin. R. § 11-55, Appendix C.

at the facility include the following:  Paved
access road and truck turnaround near the
facility, concrete holding yards and gravel arm
races, a milking parlor, implement shed, calving
sheds, waste settling pond and storage pond,
effluent and sludge pumps and distribution system,
feed silos, potable water tanks for the milking
parlor and livestock consumption, and an
individual wastewater system (IWS).

Additional improvements around the farm and
not at the dairy facility include the following:
Installation of an irrigation water supply,
storage, and distribution system, livestock
paddocks for grazing areas, cow walkways/races and
farm roads, potable water distribution systems for
livestock consumption with watering facilities and
concrete troughs, upgrades to the existing potable
water well and new transmission mains for the
dairy facility, and an animal cemetery.

Potential future expansion to up to 2000 cows
will be considered for the site, following the
review of other applicable permits or reviews
needed for expansion.  Potential expansion would
occur at a date to be determined, following
completion of the work indicated herein.  A
separate NPDES Permit, for Construction Stormwater
Activities, will be obtained for disturbances
greater than 1 acre, as needed, should expansion
work be performed in the future.

[Decl. of Kyle Datta ("Datta Decl."),[17] filed 11/25/15 (dkt. no.

44), Exh. A at 5.]  The May 2016 EIS also states that the project

area is 557 acres and describes the "Proposed Use & Components"

as:  "Agriculture (Dairy) use for dairy buildings, roads, sheds

and ponds, paddocks, cow races, farm roads, irrigation system,

water storage, drainage ways, setbacks/vegetated buffers."  [May

---

[17] Kyle Datta is the General Partner of Ulupono.  [Datta
Decl. at ¶ 1.]

2016 EIS at 2.]  The Court therefore FINDS that, for purposes of
the Summary Judgment Motions, because Defendants' actions were
undertaken as part of a common plan of development, they needed
an NPDES permit for all of their activities.[18]

### 2.   Discharge of Pollutant to Navigable Waters

It is clear to the Court that Defendants engaged in
activities pre- and post-Complaint that required an NPDES permit.
The Court must still consider whether any pollutants created as a
result of these actions were discharged into navigable waters.

### i.   Navigable Waters

According to Tom Nance, President of Tom Nance Water
Resource Engineering:

> 8.   The [Project Site] drains into two major
> ditches running mauka to makai.
> Additionally, runoff from offsite drains in
> the [Project Site] area.  The offsite
> tributary area is about 1200 acres, most of
> which is the steep lands which enclose
> Maha`ulepu Valley.
>
> 9.   Generally, runoff from the west side of the
> valley sheet flows or is conveyed via shallow
> concentrated flow through the various system
> of ridges and valleys along the west side of
> Maha`ulepu Valley.  Runoff concentrates into

---

[18] Defendants also cite the 2/5/1998 Pendergast Letter to
support their position that "the EPA has explained that pre-
operation construction and post-construction operations are
treated differently under stormwater permitting regulations."
[Defs.' Combined Mem. at 8.]  The distinction that Defendants
attempt to draw is irrelevant here because the Court has
determined that Defendants' activities are part of a common plan
of development, and therefore any agricultural exclusion does not
apply.

28

several ditches created by prior agricultural operations, before ultimately collecting into one of the major ditches that runs mauka to makai along the west side of the far, and along the proposed location of the dairy facility.  This ditch conveys both water collected from the various tributary ditches, and also sheet flow from the west side of the farm, to the makai boundary of the farm along Maha`ulepu Road, before leaving he site and ultimately flowing into the ocean.

10.  Similarly, runoff from the east side of the valley sheet flows or is conveyed via shallow concentrated flow through the various system of natural drainageways along the east side of Maha`ulepu Valley.  Runoff concentrates into several ditches, created by prior agricultural operations, before ultimately collecting into one of the major ditches that runs mauka to makai along the central or east side of the farm.  This ditch conveys both water collected from various tributary ditches and sheet flow from the central and eastern areas of the farm, to the makai boundary of the farm along Maha`ulepu Road, before leaving the site and ultimately flows into the ocean.

[Defs.' CSOF in Opp., Decl. of Tom Nance ("Nance Decl.") at ¶¶ 8-10.]  It is undisputed that the Pacific Ocean is a "navigable water" under the Clean Water Act.  Moreover, this district court has explained:

The plurality in Rapanos [v. United States] made clear that the prohibition in the Clean Water Act is not limited to "the addition of any pollutant **directly** to navigable waters from any points source," but rather extends to "the addition of any pollutant **to** navigable waters." Rapanos, 547 U.S. [715,] 743, 126 S. Ct. 2208 [(2006)] (emphasis in original) (internal quotation marks omitted).  "Thus, . . . lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream

29

> likely violates § 1311(a), even if the pollutants discharged from a point source do not emit directly into covered waters, but pass through conveyances in between." <u>Id.</u> (internal quotations marks omitted).

<u>Haw. Wildlife Fund</u>, 24 F. Supp. 3d at 995.

### ii.  **Point Source**

This Court has concluded that the Project Site is part of a common plan of development to which the agricultural exemptions under the relevant regulations do not apply.  In <u>Na Mamo</u>, this district court determined that "[c]onstruction, as described in 40 C.F.R. § 122.26(b)(14)(x), is a point source activity."[19]  28 F. Supp. 2d at 1261.  Moreover, in <u>California Sportfishing Protection Alliance v. Diablo Grande, Inc.</u>, the district court found that "[the d]efendant's development of well over five acres of the [p]roperty is 'construction activity' not within the agricultural, silvicultural, or any other exception to the permit requirements or point source definition.  By identifying [the d]efendant's construction activity on the [p]roperty, [the p]laintiff has sufficiently identified a 'point

---

[19] 40 C.F.R. § 122.26(b)(14)(x) defines "industrial activity," in part, as:

> Construction activity including clearing, grading, and excavation, except operations that result in the disturbance of less than five acres of total land area.  Construction activity also includes the disturbance of less than five acres of total land area that is part of a larger common plan of development or sale if the larger common plan will ultimately disturb five acres or more[.]

source.'"  209 F. Supp. 2d 1059, 1077 (E.D. Cal. 2002) (citation

omitted).  The Court FINDS that, for purposes of the Summary

Judgment Motions, the construction that Plaintiff has identified

on the Project Site, see supra Section II.D., identifies a point

source under the Clean Water Act.

### iii. Effectiveness of BMPs

On September 9, 2015, licensed civil engineer Ross

Dunning ("Dunning") visited the Project Site ("Dunning Visit").[20]

[Decl. of Ross Dunning ("Dunning Decl."), filed 11/25/15, dkt.

no. 45, at ¶¶ 1, 6.]  During the Dunning Visit, he observed

thirty-five-foot "vegetative buffers" that "were still in place

and that . . . were of a height and density that suggested to me

that the vegetation had been in place before the commencement of

construction reported to be in February of 2014."  [Id. at ¶ 12.]

Dunning contends that the vegetative buffer is a sediment control

Best Management Practice ("BMP") and that "the vegetated buffers

should have adequately reduced the discharge of sediments from

soils disturbed during construction and pasture renovation

activities."  [Id. at ¶ 13.]  Moreover, Dunning notes that there

was a "significant rainfall event" before his visit and "though

water was observed in the drainage channels shown to me, flowing

---

[20] In addition to being a "licensed profession Civil
Engineer and Certified Erosion and Sediment Control Lead in the
State of Washington," Dunning is also the "Stormwater Practice
Leader and Principal for Kennedy/Jenks Consultants."  [Dunning
Decl. at ¶¶ 1-2.]

water from the fields into the onsite drainage channels was not observable from my vantage point." [Id. at ¶ 11.] Dunning also provided his opinion on the effectiveness of the vegetative buffers, explaining:  "I did not directly observe runoff from the [Hawai`i Dairy] fields into the discharge channels that transect the [Project Site] due to the presence of the dense, well-established vegetated buffers described above aligning the banks of the drainage channels." [Id. at ¶ 14.]

On March 29 and 30, 2015, Erickson visited the Project Site ("Erickson Visit"). [Erickson Decl. at ¶ 7.] During the Erickson Visit, he collected water and soil samples, and also noted the extensive construction activity that had taken place at the Project Site. [Id. at ¶¶ 7, 9.] After analyzing the soil samples Erickson collected, he concluded that "[t]he fine nature of these soil types means that precipitation events, especially intense rainfall,[21] will quickly move through and across the [Project Site], finding its way to ditches and other conduits that eventually converge with the Waiopili Stream." [Id. at ¶ 28.] Moreover, "the extensive network of drainage ditches and

---

[21] Erickson states that any rainfall of half an inch or more "would have been enough to transport the dirt, sediment, or other pollutants from [Hawai`i Dairy's] ground-disturbances into ditches and surface waters on the proposed dairy site." [Erickson Decl. at ¶ 39.] Defendants disagree. See Nance Decl. at ¶ 13 ("Erickson's contention that a rainfall event of 0.5 inches is sufficient to transport pollutants to the ditches is unsupported by facts and/or reasoning.").

32

canals were installed to promote rapid runoff and prevent ponding on crop land to allow farming on the [Project Site]." [Id.] Erickson observed "no effort to maintain any vegetative buffer and we did not observe any evidence of a BMP on the [Project Site]," and "[c]ontrary to Mr. Dunning's opinion, I do not believe that any Best Management Practices have been implemented effectively such that any discharges have been and are being prevented."[22]   [Id. at ¶¶ 36, 43.]

There is some dispute about the amount of rain that has fallen in Maha`ulepu Valley since June 1, 2015.  Compare Erickson Decl. at ¶ 39 ("Since June 1, 2015, there have been at least 46 days of recorded rainfall at 0.5 inches or greater, any and all of which would have been enough to transport the dirt, sediment, or other pollutants from [Hawai`i Dairy's] ground-disturbances into ditches and surface waters on the proposed dairy site."), with Defs.' CSOF in Opp., Decl. of Peter Munn ("Munn Decl.") at

---

[22] Defendants dispute Erickson's findings.  See, e.g., Nance Decl. at ¶ 13 (noting that Erickson's "contention that a rainfall event of 0.5 inches is sufficient to transport pollutants to the ditches is unsupported by facts and/or reasoning"); id. at ¶ 28 (asserting that Erickson's "opinions heavily rely on general references to soil and water quality samples without providing any explanation of how he reaches his conclusions from those samples, or any specificity as to location, date, and/or time of any alleged pollutant discharge").  However, on a motion for summary judgment, "[t]he court does not make credibility determinations or weigh conflicting evidence." Kauhako v. State of Haw. Bd. of Educ. Dep't of Educ., Civil No. 13-00567 DKW-BMK, 2015 WL 5312359, at *7 (D. Hawai`i Sept. 9, 2015) (citing Nelson v. City of Davis, 571 F.3d 924 (9th Cir. 2009)).

¶¶ 11-12 (explaining that his company did not recognize that the rain data from the rain gauges was incorrect "because of unfamiliarity with the U.S. standard units of measurement and because of unfamiliarity with the climate at the [Hawai`i Dairy] site," and that the amount of rainfall recorded in 2015 is was actually 31.7 inches, not 124.7 inches).[23]   However, Defendants do not dispute that, since June 1, 2015, there have been some days on which it has rained 0.5 inches or more at the Project Site.

In <u>Molokai</u>, this district court explained that the "[d]efendants apparently believe that on the day construction ceases, the violations become 'wholly past' under the <u>Gwaltney</u> doctrine," but that this "fails to account for the interplay of rainwater and the construction site, an interaction that the [Clean Water] Act and its regulatory scheme is intended to manage." 891 F. Supp. at 1400. "It is the discharge of water without permit coverage that violates the [Clean Water] Act, not the construction activity itself." <u>Id.</u> As such, "for [the d]efendants to show that they were not in violation of the [Clean Water] Act, they would have to eliminate all issues of fact concerning whether **any** pollutants were discharged during the

---

[23] Peter Munn is the Chief Executive Officer and Managing Director of Harvest Electronics, the company that monitors Hawai`I Dairy's rain gauge data, among other things. [Munn Decl. at ¶¶ 1, 5.]

period in which [the p]laintiffs filed their Complaint." <u>Id.</u> at 1401 (emphasis in <u>Molokai</u>).[24]   Here, Plaintiff has identified a pollutant (the storm water runoff from Defendants' construction activities) from a point source (the Project Site) that was discharged to navigable waters (the drainage systems at the Project Site and the path they follow to the Pacific Ocean).[25] The record also establishes that these activities took place before and after the Complaint was filed.   Though there are questions of material fact regarding the sufficiency of

---

[24] Defendants argue that, even if pollutants were discharged from a point source at the Project Site after the Complaint was filed, "the continued contribution of discharge from these point sources would not constitute further discharge because the continuing effects of any purported prior discharges do not constitute present discharges in violation of the [Clean Water Act]." [Defs.' Combined Mem. at 11-12.]   To support their position, Defendants cite <u>Hamker v. Diamond Shamrock Chemical Co.</u>, where the Fifth Circuit found that "[m]ere continuing residual effects resulting from a discharge are not equivalent to a continuing discharge." 756 F.2d 392, 397 (5th Cir. 1985).   In <u>Hamker</u>, however, "[t]he complaint allege[d] facts constituting only one discharge of oil from defendant's pipe." <u>Id.</u> (internal quotation marks omitted).   The instant case is easily distinguishable because, as this district court stated in <u>Molokai</u>, "[e]ven if construction had ceased and erosion control measures were in place, [the d]efendants were in violation of the [Clean Water] Act . . . failing proof of a complete absence of storm runoff." 891 F. Supp. at 1402 (footnote omitted).

[25] At the hearing, Defendants represented that Plaintiff had not shown any ditch or other conduit for pollutants that was created by Hawai`i Dairy during construction.   However, "defendants need not construct the conveyances 'so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water.'" <u>Evtl. Prot. Info. Ctr. v. Pac. Lumber Co.</u>, 469 F. Supp. 2d 803, 821 (N.D. Cal. 2007) (quoting <u>Concerned Area Residents for Env't v. Southview Farm</u>, 34 F.3d 114, 118 (2d Cir. 1994)).

Defendants' vegetative buffers and the effect of rainfall on the Project Site, the Court concludes that Plaintiff has "adduc[ed] evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." Sierra Club, 853 F.2d at 671 (citation and internal quotation marks omitted).  Moreover, "[i]f the defendant fails to convince the court that there are no genuine issues of fact after the plaintiff offers evidence to support the allegations of ongoing noncompliance, the cause goes to trial on the merits." Id. at 669 (citing Gwaltney, 484 U.S. at 66).  Defendants' Summary Judgment Motion is therefore DENIED.

## III. **Plaintiff's Summary Judgment Motion**

Plaintiff's Summary Judgment Motion seeks "partial summary judgment finding Defendants liable for illegally undertaking facility construction without a required [NPDES] permit." [Pltf.' Combined Mem. at 1.]  Specifically, Plaintiff argues that:  since filing the Complaint, Defendants have continued construction at the Project Site; there have been many instances of rainfall that exceeds 0.5 inches since that time; and "[r]ainfall events of this magnitude interact with the disturbed ground causing surface runoff." [Id.]  The Court has already determined that there are questions of material fact about the effect of rainfall on the Project Site and the existence and/or effectiveness of the vegetative buffers. See

36

*supra* Section I.D.2.iii.  As such, there is a genuine dispute of material fact regarding the discharge of pollutants, and Plaintiff's Summary Judgment Motion must be DENIED.

## IV.  **Motion for Leave**

The Motion for Leave seeks permission from the Court to file two additional declarations and corresponding documents related to:  the corrected rainfall data; Erickson's qualifications; and "exhibits necessary to respond to arguments raised in Defendants' [Combined Memorandum]."  [Motion for Leave at 2.]  The Court has not considered these declarations or documents in reaching its conclusions on the Summary Judgment Motions.  Moreover, it is clear to the Court that Plaintiff's additional submissions would not alter its decision on Defendants' Summary Judgment Motion, nor, given the competing evidence with regard to the sufficiency of the vegetative buffers, its decision on Plaintiff's Summary Judgment Motion.  The Motion for Leave is therefore DENIED AS MOOT.

## CONCLUSION

On the basis of the foregoing, Defendants' Motion for Summary Judgment, filed on November 25, 2015, Plaintiff's Motion for Summary Judgment on Liability, filed on July 1, 2016, and Plaintiff's Ex Parte Motion for Leave to File Supplemental Declarations in Support of Reply to Motion for Partial Summary Judgment, filed on September 1, 2016, are all HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII,



   /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**FRIENDS OF MAHA`ULEPU, INC. V. HAWAI`I DAIRY FARMS; CV 15-00205 LEK-BMK; ORDER DENYING: (1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; (2) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY; AND (3) PLAINTIFF'S EX PARTE MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATIONS IN SUPPORT OF REPLY TO MOTION FOR PARTIAL SUMMARY JUDGMENT**